CITY OF KLAMATH FALLS, OREGON, Plaintiff,

v.

Bruce BABBITT, Secretary, United States Department of the Interior, Defendant,

and

Save Our Klamath River, et al., and the State of Oregon, Defendants–Intervenors.

Civil Action No. 94–2037 (NHJ).

United States District Court, District of Columbia.

May 10, 1996.

Peter S. Glaser, Doherty, Rumble & Butler, P.A., Washington, DC, for City of Klamath Falls, Oregon.

Margo Dale Miller, Alfred Thomas Ghiorzi, U.S. Department of Justice, Environment and Natural Resources Division, Washington, DC, for Bruce Babbitt.

William F. Cloran, Denise G. Fjordbect, Department of Justice, Assistant Attorney General, Salem, OR, pro hac vice, for State of Oregon.

Peter M.K. Frost, National Wildlife Federation, Portland, OR, pro hac vice, Karl G. Anuta, Larry N. Sokol & Associates, P.C., Portland, OR, pro hac vice, for Save Our Klamath River, Northwest Environmental Defense Center, National Wildlife Federation, Sierra Club, American Rivers, Inc., Oregon Natural Resources Council, Pacific Rivers Council, Oregon Trout, Inc.

## MEMORANDUM OPINION

NORMA HOLLOWAY JOHNSON, District Judge.

Plaintiff, the city of Klamath Falls, Oregon, challenges a decision by the Secretary of the Interior to designate an eleven-mile long section of the Klamath River as a National Scenic River under the National Wild and Scenic Rivers Act. The parties have agreed that no material factual disputes exist in this case. Presently before the Court are the cross motions of the parties for summary judgment. Motions for summary judgment have been filed by plaintiff, by defendant Bruce Babbitt, Secretary of the Interior, and by defendants-intervenors, a number of conservation groups who intervened in this action in January 1995. The State of Oregon, which is also an intervenor, has filed a memorandum in support of Babbitt's motion for summary judgment. The Court has carefully considered the motions of all parties, the voluminous administrative record, and the oral argument of the parties at a hearing on this matter. For the reasons set forth below, the Court concludes that it must deny plaintiff's motion and grant the motions of defendants.

## Background

The city of Klamath Falls is the sponsor of the Salt Caves Hydroelectric Project, a controversial project which it proposes to construct on the Klamath River. It has been working on this project since the early 1980s and sees the project as a way to improve the suffering economy of the city. In order to construct the project, the city must obtain a license from the Federal Energy Regulatory Commission ("FERC"). The city applied for a FERC license in November 1986.

Pursuant to a ballot initiative in 1988, the voters of Oregon designated the Klamath River, from the John Boyle Dam Powerhouse to the Oregon/California border, as a state scenic waterway. That part of the river includes the location on which the city plans to build the hydroelectric project. State designation does not prevent FERC from licensing a hydroelectric project on the river. Designation of a river into the federal Wild and Scenic Rivers System, however, does prohibit FERC from licensing a hydroelectric project on the river. *See* 16 U.S.C. § 1278(a) (1994).

In April 1993, Oregon Governor Barbara Roberts requested that the Secretary of the Interior designate the section of the Klamath River into the federal Wild and Scenic Rivers System. She wrote:

Dear Secretary Babbitt:

The State of Oregon has had a state Scenic Waterway Act since 1970. Enacted through a citizen's initiative, this Act embodies Oregon's strong commitment to protecting our natural treasures. Our program directs state agencies to protect the free-flowing character of the waterway in perpetuity, and imposes land use controls on all state and private lands within ⅛ mile of either bank of the river.

In 1988 the citizens of Oregon voted to protect the Upper Klamath River from the John Boyle Dam Powerhouse to the Oregon/California border. Also in 1988, Con-

gress asked the Bureau of Land Management to determine whether the Upper Klamath was eligible and suitable for designation as a Wild and Scenic River. That study, completed in March 1990, concluded that the segment designated under the state program is both eligible and suitable for federal designation.

Congress has not acted on the results of this study. Meanwhile, the Upper Klamath is immediately threatened by the proposed Salt Caves Hydroelectric Project No. 10199, under the jurisdiction of the Federal Energy Regulatory Commission. Therefore, I am formally requesting that the Upper Klamath River, from the John Boyle Dam Powerhouse to the Oregon/California border, be designated as a federal Wild and Scenic River pursuant to section 2(a)ii of the federal Wild and Scenic Rivers Act of 1968 (Public Law 90–542 as amended).

A.R. 2799–2800. The Department of the Interior forwarded the request to the National Park Service ("NPS") for consideration and evaluation. After evaluating the merits of the governor's application and the environmental effects of designating the river into the Wild and Scenic Rivers Systems, NPS issued a draft Klamath River Eligibility Report and Environmental Assessment ("Draft Report/EA"). The Draft Report/EA was released for public review and comment. The Department of the Interior concluded that the National Environmental Policy Act ("NEPA") did not require the preparation of an Environmental Impact Statement ("EIS"). In August 1994, NPS issued a final Report/EA. The Report/EA concluded that the Klamath River satisfied the eligibility requirements for designation into the Wild and Scenic Rivers System as a "scenic," but not a "wild," river.

The Secretary approved the Governor's recommendation on September 22, 1994, after issuing a Finding of No Significant Impact ("FONSI"), and designated the portion of the Klamath River into the National Wild and Scenic Rivers System as a National Scenic River. That same day, the city brought the present lawsuit. Because of the designation, the city is precluded from continuing to

seek a FERC license for the proposed hydroelectric project. The city seeks to invalidate the Secretary's decision, alleging that the Secretary violated NEPA, the Administrative Procedure Act ("APA"), and the National Wild and Scenic Rivers Act ("WSRA"). Plaintiff seeks a declaration that the designation is unlawful and an order enjoining the designation. Plaintiff does not challenge whether the river has such remarkable characteristics that it can qualify as a National Scenic River, but challenges the procedures leading up to the designation. The Court will first address whether plaintiff has standing to bring this action, then address plaintiff's arguments under each of the three statutes.

### Discussion

### I. Standing

The Secretary argues that the city lacks standing to bring this case. He claims that the city has not alleged an appropriate injury because, even if the designation were overturned, the city cannot show that it would get approval from FERC for its project. He also argues that the city's alleged injury is not within the zone of interests protected by NEPA because the city is trying to use the environmental protection laws to get approval for its hydroelectric project, not to protect the free-flowing state of the river. The Supreme Court has defined the elements of standing:

First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (citations omitted).

■ With respect to the Secretary's injury-in-fact argument, plaintiff has admitted that even if it wins this case, the city would still need to obtain another state permit, a FERC license, and water rights, as well as make numerous logistical arrangements, before it could begin construction of the hydroelectric project. Because these steps remain, the Secretary argues that plaintiff does not have standing because it cannot establish that a favorable decision from this Court will result in its ability to build the hydroelectric project.

The city brings this case, however, in order to have the *chance* to continue working on the project. It is clear that under the statutory framework of the WSRA, the Secretary's designation prevents the city from obtaining a FERC license for the project. Were the designation invalidated, the City could continue to petition for the FERC license and the project would remain a possibility. The Court concludes that the city has suffered injury as a result of the Secretary's designation that is sufficient to satisfy the standards of *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–61, 112 S.Ct. 2130, 2135–37, 119 L.Ed.2d 351 (1992).

■ The Secretary next argues that the city lacks standing because the city's injury does not fall within the zone of interests sought to be protected by NEPA or WSRA. As explained in *Lujan v. National Wildlife Federation*, 497 U.S. 871, 883, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990), to be adversely affected or aggrieved within the meaning of a statute, a plaintiff must establish "that the injury he complains of (*his* aggrievement, or the adverse effect *upon him* ) falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Id.* at 883, 110 S.Ct. at 3186. The Secretary argues that, because the purpose of NEPA is to protect the environment and the purpose of the WSRA is to protect free-flowing rivers with certain remarkable characteristics, the city's interest in reversing the Secretary's designation so that it can pursue the development of a hydroelectric plant is not within the zone of interests of either statute. The relief plaintiff requests, the Secretary argues, would produce a result that the Acts were designed to *prevent.*

The Secretary's position is supported by the reasoning of a recent Ninth Circuit decision in a case brought under the Endangered Species Act, *Bennett v. Plenert*, 63 F.3d 915 (9th Cir.1995), *cert. granted*, —— U.S. ——, 116 S.Ct. 1316, 134 L.Ed.2d 469 (1996). In *Bennett*, the Ninth Circuit concluded that plaintiffs who asserted no interest in preserving endangered species could not sue the government for violating the procedures established in the Endangered Species Act. *Id.* at 916. The present case can be distinguished from *Bennett*, however, because plaintiff is a municipality. The city represents the many interests of the people of Klamath Falls. Although the city readily admits that its main goal is the economic benefit it thinks would derive from the proposed hydroelectric plant, it also represents other interests, including an interest in the general conditions of the Klamath Basin. The city contends that the hydroelectric project would provide significant ecological benefits to the river by alleviating some of the problems caused by the upstream dam, which alters the flow and temperature of the water in the summer months.

It is not for this Court to decide what policy is the best for improving the degraded condition of the Klamath River and Basin. Because plaintiff argues that it has an interest as a municipality in the condition of the river and basin, and because plaintiff argues that it believes the hydroelectric plant could actually solve some of the basin's ecological problems, the Court must conclude that the city is arguably within the zone of interests of NEPA and the WSRA and thus does have standing to bring this action.

## II. National Environmental Policy Act ("NEPA")

■ The purposes of NEPA are "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and

natural resources important to the Nation; and to establish a Council on Environmental Quality." 42 U.S.C. § 4321 (1994). To ensure that the government maintains its commitment to protect the environment, NEPA requires federal agencies to follow certain procedures in their decision making processes.

> [A]ll agencies of the Federal Government shall . . . (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C) (1994). The Council on Environmental Quality ("CEQ") has promulgated regulations giving agencies specific guidance for complying with NEPA. 40 C.F.R. §§ 1500–1508. The sweeping policy goals announced in NEPA are thus realized through a set of "action-forcing" procedures that require agencies to take a "hard look" at environmental consequences and disseminate relevant environmental information to the public. Although these procedures are almost certain to affect the agency's substantive decision, NEPA itself does not mandate particular results, but simply prescribes the necessary process. See Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350, 109 S.Ct. 1835, 1845–46, 104 L.Ed.2d 351 (1989).

■ The CEQ has promulgated regulations governing whether an agency must prepare an environmental impact statement. 40 C.F.R. § 1501.4. According to § 1501.4, an agency first prepares an environmental assessment ("EA"), and based on that assessment, determines if it is necessary to prepare an environmental impact statement. An EA is a "concise public document" that "[b]riefly provides sufficient evidence for determining whether to prepare" an EIS. 40 C.F.R. § 1508.9(a). An EA must discuss only "appropriate alternatives," and include a "brief discussion of . . . environmental impacts." 42 U.S.C. § 4332(2)(E);. 40 C.F.R. § 1508.9(b). In preparing an EA, an agency must take a "hard look" at the environmental impact of the proposed action and alternatives. Coalition on Sensible Transp., Inc. v. Dole, 826 F.2d 60, 66 (D.C.Cir.1987). After preparing an EA, if an agency determines that an EIS is necessary, it will begin to prepare the EIS. If the agency determines on the basis of the EA that an EIS is not necessary because the implementation of the proposed agency action will not significantly affect the quality of the human environment, the agency will prepare a Finding of No Significant Impact ("FONSI") and will not prepare an EIS. Id.

Plaintiff argues that the Secretary's designation of the Klamath River violates NEPA because the designation is based on a flawed EA, prepared by the National Park Service ("NPS"), that ignores all of the major resource issues facing the Klamath River and fails to explain the basis of its conclusion. The Secretary responds that the record shows NPS took an appropriately hard look at the environmental impacts that would occur if the Secretary approved the Klamath as a federal Wild and Scenic River.

The EA, which is 76 pages long, covers a wide range of issues including a discussion of state and federal law, the remarkable values of the river, the developments along the river, the water quality, other studies of the river, the Bureau of Land Management monitoring of the river, and the environmental consequences of the options reasonably available to the Secretary. The NPS found that the Klamath has an abundance of outstandingly remarkable characteristics. For example, the Klamath offers exceptional whitewater rafting opportunities due to the quality and variety of rapids on that stretch of the river. Rafters are willing to travel long distances to experience the technically challenging whitewater rapids, which run all summer as a result of the water released from the

John Boyle Dam upstream. The Klamath and its surrounding land are home to numerous wildlife species, including many threatened and endangered species, such as peregrine falcons, bald eagles, golden eagles, Townsend's big-eared bats, ringtail cats, osprey, river otters, wild rainbow trout, shortnose suckers, and lost river suckers. The Klamath River Canyon is considered sacred by two distinct Native American groups, the Klamath Tribes and the Shasta Nation, and has tremendous spiritual significance. The canyon has had continuous use by Native Americans for the last seven thousand years. The city does not challenge these findings.

■ The city primarily challenges the sufficiency of the EA because the NPS did not consider building the hydroelectric project as an "alternative." The NPS gave serious consideration to two main options: (1) to designate the river into the federal Wild and Scenic Rivers System, or (2) *not* to designate the river into the federal Wild and Scenic Rivers System. It appears that the "alternatives" that plaintiff wanted the NPS to consider were those alternatives that were before FERC. The Secretary of the Interior was not required to address the various dam alternatives that FERC was considering, however, because those options had nothing to do with the Wild and Scenic designation. As the Secretary stated in his memorandum, consideration of the best option for hydroelectric production was not an issue before him. Govt. Mem. at 2. Requiring the Secretary of the Interior to study every speculative use of the river before approving a recommendation that a river be designated into the Wild and Scenic Rivers System would place a burden on the Secretary that Congress did not intend and that would make it difficult for the Secretary to comply with NEPA and the WSRA.

Contrary to the city's arguments, the EA did examine how designating the Klamath River would work with other efforts to improve the water quality of the river basin. The EA concluded that designation "will enhance many of the protections already in place for the upper Klamath River and will fill the gaps in those protections." A.R. at 85. In addition, the EA concluded that without the long-term protection that federal designation would offer, the river might suffer gradual, negative impacts on its natural, recreational, and cultural values. *Id.* The EA also noted that designation would preclude federal water resource projects that would alter the free-flowing condition of the river or degrade the outstanding resources present. *Id.*

The Court concludes that the EA discusses the appropriate alternatives and takes a "hard look" at the environmental impacts of approving the Klamath as a federal Wild and Scenic River. It appears that the city wants the Secretary to propose a way to solve all the ecological problems of the river and basin before taking any steps at all to protect the river. That simply was not the Secretary's obligation under NEPA or the WSRA. The Court rejects the city's arguments that the EA is inadequate.

■ The city next argues that the Secretary should have prepared an environmental impact statement instead of issuing a Finding of No Significant Impact ("FONSI") before designating the Klamath River as National Scenic River. Plaintiff argues that the designation violates NEPA because the Secretary was required to prepare an EIS but did not do so. The Secretary disagrees.

■ Courts review an agency's FONSI "to determine whether the agency considered the relevant factors in a rational way." *Public Citizen v. National Highway Traffic Safety Admin.*, 848 F.2d 256, 266 (D.C.Cir. 1988). The standard of review articulated by the Court of Appeals in *Public Citizen* applies to this case: "[The] decision not to prepare an EIS can only be overturned if the decision was arbitrary, capricious, or an abuse of discretion. Judicial review of an agency's finding of 'no significant impact' is not, however, merely perfunctory[,] as the court must insure that the agency took a 'hard look' at the environmental consequences of its decision." *Id.* (citing *Sierra Club v. Peterson*, 717 F.2d 1409, 1413 (D.C.Cir.1983)). This Court cannot "substitute [its] judgment for that of the agency as to the environmental consequences of its actions." *Public Citizen*, 848 F.2d at 267.

Rather, the Court's "more limited role is to ensure, primarily, that no arguably significant impacts have been ignored." *Id.* "Evaluating the 'impact' of those consequences on the 'quality of the human environment,' however, is 'left to the judgment of the agency.'" *Id.*

The Secretary's decision not to prepare an EIS was rational because designation of the river as a National Scenic River will not change the environmental status quo. The EA concluded that the only major differences between doing nothing at all and designating the river into the federal system were that, under the designation alternative, hydroelectric projects such as the city's proposed project could not be built, and the number of visitors to the river might increase. Because the river is already protected under the state scenic rivers system, the practical effect of the designation is simply to protect the river from federal hydroelectric development, as mandated by the statutory scheme of the WSRA. The city appears concerned about why FERC was required to prepare an EIS for the proposed hydroelectric plant, but NPS was not required to prepare an EIS for the Wild and Scenic River designation. The answer is because a FERC–approved dam on the Klamath River would significantly change the environment, but Wild and Scenic designation would not. At the hearing on this matter, the city argued that "there is no 'status quo' on the Klamath" because various "management options," exist, such as constructing the hydroelectric project. These so-called "management options" refer to possible future events. "Status quo," by definition, means "the existing state of affairs at the time in question." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2230 (1993). The Court rejects the city's argument because, by sheer definition, management options can have no effect on the status quo. The Court concludes that the Secretary's decision not to prepare an EIS was not arbitrary, capricious, or an abuse of discretion, and that the Secretary took a "hard look" at the environmental consequences of designating the Klamath River as a National Scenic River.

## III. Administrative Procedure Act ("APA")

Plaintiff argues that the designation violates the APA because the Secretary failed to prepare an explanation on the record of the reasons for his action. Reviewing the Secretary's actions under the "arbitrary and capricious" standard, the Court concludes, for the reasons stated above in its discussion of the Secretary's complying with the requirements of NEPA, that the Secretary's decision to approve the designation of the Klamath River into the federal Wild and Scenic Rivers System was not arbitrary and capricious and that the Secretary established a rational connection between the facts found and the choice made.

## IV. Wild and Scenic River Act ("WSRA")

The Wild and Scenic Rivers Act provides that the Secretary may designate rivers into the National Wild and Scenic Rivers System if the rivers have been "designated as wild, scenic or recreational rivers by or pursuant to an act of the legislature of the State or States through which they flow...." 16 U.S.C. § 1273(a)(ii) (1994). The Klamath River was designated into the Oregon state system through a voter initiative, "Ballot Measure 7." Plaintiff claims that the Secretary's designation of the Klamath into the federal system violates the WSRA because it is not based on "an act of the legislature" of Oregon as required by the statute.

Defendants, including the State of Oregon, maintain that the voter initiative *was* an "act of the legislature." In Oregon, the legislative assembly meets every two years. The citizens have reserved for themselves the power to legislate by voter initiative.[1] OR. CONST. art. IV, § 1. The citizens of Oregon are considered to be a branch of the government because they can legislate by voter initiative. In its absorbing memorandum to the Court, the State of Oregon thoroughly details the history of the voter initiative process in Oregon and the ways in which federal courts and Oregon state courts have respect-

---

1. A voter initiative actually creates law, as opposed to a voter referendum, in which citizens vote on a law that has been passed by the elected legislature.

ed these initiatives as the expressed will of one branch of the State's lawmaking power. *See* Or.'s Mem. at 5–20. Because initiatives are direct legislation by the voters, it is clear that the Klamath River initiative is an "act of the legislature." In fact, it appears that the Court would unconstitutionally violate the right of the people of Oregon to govern themselves if the Court determined that the initiative was *not* an act of the Oregon legislature. *See* U.S. CONST. amend. X. Accordingly, the Court rejects the argument of the city that the designation of the Klamath River into the federal Wild and Scenic Rivers System was contrary to the WSRA because the state designation was not an act of the legislature.

 Finally, plaintiff argues that the designation violates the WSRA because Congress amended the WSRA to withdraw the Secretary's authority to designate the Klamath River into the National Wild and Scenic Rivers System. Congress amended the WSRA in 1988 to select the Upper Klamath River for study by the Secretary to determine the eligibility and suitability of the river for the National Wild and Scenic Rivers System. The Secretary's report, which was submitted to Congress in March 1990, concluded that the Klamath was suitable for designation into the National Wild and Scenic Rivers System. Congress has taken no further action on this issue. Plaintiff claims that, because of this amendment, the Secretary lacked authority to designate the Klamath River into the federal system. The Court simply cannot conclude that Congress took away the Secretary's power to designate the Klamath when it authorized study of the Klamath. The amendment does not state that the Secretary no longer has authority to designate the Klamath, and the Court has no reason to infer that Congress implicitly intended to withdraw the Secretary's authority.

### Conclusion

The Court concludes that the Secretary was required by law to process Governor Roberts's recommendation to him that the Klamath River be designated into the federal Wild and Scenic Rivers System. The Secretary processed the recommendation properly and, after appropriate study of the environmental impacts of the proposed action, designated the river as a National Scenic River. Although the Court understands the city's distress about the preclusion of its hydroelectric project, the statutory mandate is clear. Congress decided that FERC would have no authority to license a hydroelectric project on a National Scenic River.

The motion of defendants for summary judgment will be granted and the motion of plaintiff for summary judgment will be denied. An Order to this effect will issue on this date.

### *ORDER*

Before the Court are the cross motions of all parties for summary judgment. The parties have agreed that no material factual disputes exist in this case. Motions for summary judgment have been filed by plaintiff, by defendant Bruce Babbitt, Secretary of the Interior, and by the defendants-intervenors, a number of conservation groups who intervened in this action in January 1995. The State of Oregon, which is also an intervenor, has filed a memorandum in support of Babbitt's motion for summary judgment. The Court has carefully considered the motions of all parties, the voluminous administrative record, and the oral argument of the parties at a hearing on this matter. For the reasons set forth in the Memorandum Opinion issued on this date, it is this 10th day of May 1996,

ORDERED that the motion of plaintiff [# 30] be, and hereby is, denied; it is further

ORDERED that the motions of defendant and defendants-intervenors [# 46 & 31] be, and hereby are, granted; it is further

ORDERED that the motion of plaintiff to strike affidavits and exclude certain documents from the record [# 41] be, and hereby is, denied; it is further

ORDERED that any remaining motions be, and hereby are, moot; and it is further

ORDERED that this case be, and hereby is, closed.