**ADVOCATES FOR TRANSPORTATION ALTERNATIVES, INC.; John Bewick; Martha Bewick; Amanda Burgoon; Norma Kravette; Ann Collins; Marian Sherman; Dan Clark; Emily Clark; Kathleen Donohue; Colleen O'Hanley; Valerie O'Hanley; Nancy Hills; Fred Hills; and Phyllis Koch, Plaintiffs,**

v.

**U.S. ARMY CORPS OF ENGINEERS; Hon. Francis J. Harvey; Lieutenant General Carl A. Strock; Colonel Thomas L. Koning, Defendants.**

v.

**Massachusetts Bay Transportation Authority, Defendant–Intervenor.**

**Civil Action No. 05–11918–WGY.**

United States District Court, D. Massachusetts.

Sept. 29, 2006.

Douglas H. Wilkins, Anderson & Kreiger LLP, Cambridge, MA, for Plaintiff.

Alan D. Greenberg, U.S. Department of Justice, Environmental Defense Section, Denver, CO, Eugenia M. Carris, United States Attorney's Office, Boston, MA, John P. Almeida, U.S. Army Corps of Engineers, Concord, MA, for Defendants.

Richard A. Nylen, Jr., Lynch DeSimone & Nylen, Boston, MA, for Defendant–Intervenor.

### MEMORANDUM AND ORDER

YOUNG, District Judge.

## I. INTRODUCTION

The plaintiffs Advocates for Transportation Alternatives, Inc.[1] and individual Massachusetts residents[2] (collectively, the "Advocates") allege that the U.S. Army Corps of Engineers ("Corps") violated federal environmental statutes by issuing a permit pursuant to the Clean Water Act to the Massachusetts Bay Transportation Authority ("MBTA") to restore commuter rail service on the Greenbush Line between Braintree and Scituate, Massachusetts. *See* Compl. ¶¶ 131–50.

The Advocates seek a permanent vacation of the permit and any other actions related to the permit, or, in the alternative, temporary enjoinment of any action in furtherance of the Greenbush Line until the Corps: (1) prepares an Environmental Impact Statement ("EIS") with respect to the Greenbush Line; (2) prepares an independent analysis of the environment and hu-

man impacts of, and alternatives to, the Greenbush Line; and (3) complies with all the requirements of the National Environmental Policy Act. *See* Compl. Prayers for Relief ¶¶ 1–12.

The Advocates filed a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. Pl.'s Mot. Summ. J. [Doc. No. 39]. The Corps filed a Cross–Motion for Summary Judgment against the Advocates. Def. Corps' Mot. Summ. J. [Doc. No. 46]. The MBTA, which has intervened in this suit as a defendant,[3] opposes the Advocates' motion and moves for summary judgment as well. Def. MBTA's Mot. Summ. J. [Doc. No. 50]. All parties submit that the suit ought be resolved by summary judgment on the agreed-upon administrative record. Joint Mot. to Enter Briefing Schedule [Doc. No. 23] at 2.

## II. UNDISPUTED FACTUAL BACKGROUND

The Old Colony Railroad system, including the Main (Boston to Braintree), Middleborough, Plymouth, and Greenbush Lines, provided freight and passenger commuter rail service between Boston and Plymouth from 1844 to 1959, with freight service running on part of the line until 1983. Administrative Record ("AR") III:8798; AR II:I–1. In 1984, the Massachusetts Legislature directed the MBTA to study the possibility of restoring the

---

1. Advocates for Transportation Alternatives, Inc. is a charitable corporation located in Hingham, Massachusetts that promotes awareness of alternative forms of transportation to conserve public land and resources. Compl. ¶ 6.

2. The Massachusetts resident plaintiffs are supporters of the Advocates for Alternative Transportation, Inc., residents who live near

the area where the Greenbush Line is situated, or who use the area for recreational purposes. Compl. ¶¶ 7–15.

3. The MBTA, the Massachusetts regional transportation authority, has intervened as a defendant in this action as owner of the property subject to the permit and as applicant for rehabilitation of the Greenbush Line. Def. MBTA Mot. to Intervene [Doc. No. 27] at 1.

commuter rail system to the southeastern region of Massachusetts. AR I:41. From that study, the MBTA concluded that it was feasible to restore commuter rail service. *Id.* Afterwards, the Governor and Legislature directed the MBTA to conduct environmental studies as part of the Old Colony Railroad Rehabilitation Project. *Id.*

The Old Colony Railroad Rehabilitation Project studied the siting and conceptual design of twenty-one proposed commuter rail stations and three layover facilities and proposed the reinstitution of these commuter rail services. AR I:41; AR II:I–1. On May 7, 1990, the MBTA and the Federal Transit Administration filed a Draft Environmental Impact Statement/Report pursuant to the National Environmental Policy Act ("NEPA")[4] and the Massachusetts Environmental Policy Act ("MEPA")[5] requirements for the proposed restoration of the commuter rail service on the Main Line and the three branch lines. The Federal Transit Administration and the MBTA "defer[red] a decision on the Greenbush Line because of a significant number of unresolved environmental concerns" and separated the Greenbush Line as an "independent project." AR I:10, AR II:I–2. In March 1992, a final Environmental Impact Statement/Report was prepared for the Main, Middleborough, and Plymouth Lines pursuant to both the NEPA and MEPA. *See* AR I:1. In September 1997, the Middleborough and Plymouth Lines were opened for commuter rail service. AR II:I–2.

The MBTA's plan to resume commuter rail service on the Greenbush Line is part of a transportation system planning process to mitigate the impact on highway traffic, promote transit, and meet obligations under the Massachusetts State Air Quality Implementation Plan and a Memorandum of Understanding arising from the Central Artery/Third Harbor project. AR I:11995, 12052–53. In December 1992, the Massachusetts Executive Office of Environmental Affairs issued the scope for the Supplemental Draft Environmental Impact Statement/Report ("Supplemental Draft Report") for the Greenbush Line project (the "Greenbush Project") that would meet both MEPA and NEPA requirements. AR II:I–2, P–12. In March 1995, the MBTA and the Federal Transit Administration published the Supplemental Draft Report that proposed and examined various transportation alternatives and their environmental impacts for the Greenbush Project. AR II:P–12. On June 1, 1995, the Massachusetts Secretary of Environmental Affairs issued a Certificate finding that the Supplemental Draft Report complied with MEPA and its implementing regulations. AR I:14386. In its Certificate, the Secretary detailed issues concerning the environmental and alternatives analyses that needed to be addressed in the Final Environmental Impact Report/Statement. *See* AR I:14386–93.

In November 1995, the MBTA, in concert with Governor William Weld, an-

---

4. NEPA requires federal agencies to prepare an EIS on any proposed major federal action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). An EIS is a "detailed statement" examining the environmental impact of the proposed action and alternatives to the proposed action. Id.

5. MEPA governs the preparation of environmental impact reports of projects undertaken directly by state agencies. See Mass. Gen. Laws ch. 30, §§ 61–62H. Environmental impact reports must contain reasonable alternatives to the proposed project and their environmental consequences. *Id.* § 62B. MEPA is regulated by the MEPA Unit of the Executive Office of Environmental Affairs. *Id.* § 62C.

nounced that they had selected restoration of the commuter rail at grade on the Greenbush Line right-of-way [6] as the preferred alternative. AR II:P–12. The Greenbush Commuter Rail alternative includes replacement of tracks, rail signal systems, layover train facilities at the end of the Greenbush Line, and seven new passenger stations with parking at Weymouth Landing, East Weymouth, West Hingham, Nantasket Junction in Hingham, Cohasset (Route 3A), North Scituate, and Greenbush. AR I:11991. In response to environmental and other concerns raised during the public review process, the MBTA amended the Greenbush Project to include: (1) a major redesign of Weymouth Landing to avoid or mitigate potential traffic impacts; (2) grade separations at specific locations at Weymouth and Cohasset so the railroad would be on a bridge over the street, instead of intersecting at grade; (3) construction of an underpass in Hingham Square to prevent intersecting at grade; and (4) redesign or relocation of two parking lots to avoid wetland and traffic impacts. AR I:12003–04.

Around the same time, MBTA announced that it would not seek federal funding for the Greenbush Project. AR II:P–12. As a result, the Federal Transit Administration withdrew from the Green-

bush Project in January 1996,[7] and the Corps became the lead agency responsible for subsequent environmental and historic impact review for the Greenbush Project. AR II:P–12–13.

On May 21, 2001, the MBTA issued the Final Environmental Impact Report on the Greenbush Project pursuant to MEPA requirements.[8] See AR II. The Final Report evaluated and compared alternatives that included: (1) no new construction; (2) enhanced bus service on the existing Greenbush right-of-way; (3) two types of commuter boat service from Hingham and Hull; and (4) various commuter rail alternatives. AR II:P–3. The alternatives were analyzed for impacts on the natural and human environment such as noise, vibration, wetlands, and traffic. AR II:P–3–5.

## A. The Corps Section 404 Permit

As a necessary part of the Greenbush commuter rail restoration, the MBTA applied for a Clean Water Act Section 404 permit ("Permit") for the discharge of dredged or fill materials into 7.6 acres of jurisdictional waters and wetlands (4.2 acres of temporary impacts, 3.4 acres of permanent impacts). AR I:11992. As a result, the Corps examined the environmental impacts of all the MBTA's pro-

6. The Greenbush Commuter Rail at grade alternative is defined as utilizing the existing vertical grade and horizontal alignment that presently exists over the Greenbush Line railbed. AR I:12001.

7. During the initial phases when the Federal Transit Administration was involved in the Greenbush Project, a Section 4(f) evaluation was required to explore possible alternatives to restore the Greenbush commuter rail service and to identify all measures to avoid and minimize harm. AR I:10. Section 4(f) of the U.S. Department of Transportation Act of 1966 stipulates that no U.S. Department of Transportation agency will approve a project which requires the use of such properties unless (1) there is no prudent and feasible

alternative to the use of the land; and (2) the project/program includes all possible planning to minimize harm to these properties. 49 U.S.C. § 303. As a result of the Federal Transit Administration withdrawal, the MBTA was no longer required to conduct a Section 4(f) evaluation. AR II:P–6–7.

8. The MBTA published the Draft and Supplemental Environmental Impact Report/Statement with the Federal Transit Administration to retain the option of applying for federal funding for the Greenbush Line project. AR II:P–5. Once MBTA decided not to use federal funding, the Final Report was required to meet MEPA requirements only. AR II:P–6.

posed activities over a 250–foot–wide corridor along the entire 18–mile Greenbush commuter rail line. AR I:12049. Through its own analysis and consultation with federal and state agencies and the general public,[9] the Corps identified issues that would be addressed in its permit review process. AR I:12048–49.

In order to determine if an EIS was needed for the Greenbush Project,[10] the Corps prepared an environmental assessment ("Assessment") that examined in detail the MBTA's proposal and alternatives such as ferry service and transportation systems management. AR I:11987–12051. The ferry service alternative (the "Ferry Alternative") would expand the commuter boat service to Greenbush area to include the purchase and operation of highspeed passenger boats. AR I:12007. The transportation system management alternative (the "Management Alternative") would use existing roadways to build on commuter bus service that would include the addition of three new park-and-ride parking lots, and the expansion of current commuter bus routes and service. AR I:12005–06. The Assessment also discussed other alternatives that were not considered in detail, such as high-occupancy-vehicle lanes, commuter rail or Red Line extension along Route 3, light rail or a trackless trolley along the Greenbush right-of-way, and others. AR I:12009–15. The Assessment examined environmental concerns such as wetlands, wildlife habitat, air quality and noise, and historic resources of the main

alternatives. AR I:12022–41. After considering the "localized adverse impacts to wetlands, historic resources, property values, and other environmental or social impacts" and mitigation projects that would lessen those impacts, the Corps concluded that the Greenbush Project did not require an EIS because the Corp's decision to approve the Permit was "not a major federal action significantly affecting the quality of the human environment." (Finding of No Significant Impact or "FONSI"). AR I:12049–51. The Corps determined that the Greenbush Project was "not contrary to the public interest" and granted the MBTA a Section 404 permit on January 3, 2005. AR I:12051. The permit authorizes the MBTA to undertake certain fill activities in connection with re-establishing commuter rail service from the existing Braintree to Boston Main Line to the Greenbush area of Scituate. AR I:11688.

**B. Section 106 Consultation under the National Historic Preservation Act**

Because the Greenbush Project was recognized as a federal undertaking that may adversely affect properties eligible for listing on the National Register of Historic Places, the MBTA was required to comply with the consultation procedures of Section 106 of the National Historic Preservation Act ("Preservation Act"). 16 U.S.C § 470f.[11] Prior to issuing the FONSI and

9. Two sets of public hearings were held. The first hearing took place on August 14, 1997, where comments were received, evaluated, and included in the Corps administrative record. AR I:12048–49. Due to numerous project changes, a second public hearing was held on April 15, 2003 that included similar comments made during the first public hearing. *Id.*

10. NEPA regulations allow a federal agency to conduct an environmental assessment if the federal action does not "normally" require an EIS or if the proposed action is categorically excluded from the NEPA requirements. 40 C.F.R. § 1501.4(a),(b).

11. In the Final Report, the MBTA conducted historical resources analyses pursuant to Section 106 of the Preservation Act. *See* AR II:VII.

the Permit, the Corps, in consultation with the Massachusetts State Historic Preservation Officer ("Preservation Officer"), concluded that the Greenbush Project will have adverse effect [12] on twenty-seven historic properties and thirty-four historic districts in the proposed project area. AR I:11998. These adverse effects include the introduction of noise, vibration, traffic, and aesthetic impacts. AR I:11998. The Section 106 alternatives analysis indicated that the potential impact of other alternatives on historical properties and districts would be less than the Greenbush Commuter Rail option, "but that these other alternatives failed to meet the transit ridership requirement" of the Greenbush Project. AR I:12030. On March 1, 2001, the Corps, the Preservation Officer, the federal Advisory Council on Historic Preservation (the "Advisory Council"), and the MBTA executed a programmatic agreement ("Agreement") ensuring that the various mitigation measures would be carried out by the MBTA. AR I:11911, 11915. The terms of this Agreement were incorporated as enforceable conditions of the Corps Permit. AR I:12045.

█ Following the issuance of the Permit, the Advocates filed this suit seeking judicial review of the Corps' issuance of a permit to the MBTA pursuant to Section 404 of the Clean Water Act, 33 U.S.C. § 1344, alleging violations of Section 404 of the Clean Water Act, NEPA, 42 U.S.C. §§ 4321 et seq., and Section 106 of the National Historic Preservation Act, 16 U.S.C. § 470f.[13] Compl. [Doc. No. 16]

¶ 2. The MBTA's contractor has begun construction in the areas that involved discharge of fill into wetlands. Aff. Andrew D. Brennan [Doc. No. 55] ("Brennan Aff.") ¶ 2, 4. Approximately 7.6 acres of wetlands have been altered; approximately 5,000 square feet of federal wetlands authorized to be altered remain unaltered as of January 27, 2006. Id. ¶¶ 8–9.

## III. DISCUSSION

### A. COUNTS I, II, III, and IV: NEPA Violations

The Advocates claim that the Corps's Assessment and resulting FONSI violated NEPA because they failed substantively to: (1) take a hard look at the environmental impacts of the proposed Greenbush Project; (2) address the required factors in determining whether to prepare an EIS; and (3) provide a convincing statement of reasons for declining to prepare an EIS. Compl. ¶¶ 132–33. The Advocates allege that the Corps' FONSI and its failure to prepare an EIS were arbitrary and capricious and an abuse of discretion. Compl. ¶¶ 135–36.

NEPA requires that federal agencies prepare an EIS on any proposed major federal action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). An EIS is a "detailed statement" examining in depth the environmental impact of the proposed action and alternatives to the proposed action. Id.

---

12. The Preservation Act regulations state that: An adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association.

36 C.F.R § 800.5(a)(1).

13. In the initial Complaint, the Advocates also alleged that the Corps violated Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403. Compl. ¶ 2. The Advocates present no argument in support of this claim in any of their summary judgment documents and it is deemed waived.

NEPA also created the Council on Environmental Quality ("NEPA Council") and authorized the NEPA Council to establish regulations setting forth environmental review procedures to be followed by federal agencies. *See id.* §§ 4342, 4344. Pursuant to its authority, the NEPA Council has promulgated detailed regulations setting forth when a federal agency must prepare a full EIS or the less extensive environmental assessment and what must be included in each. *See* 40 C.F.R. §§ 1501.3, 1501.4, 1502.1–.25, 1508.9, 1508.11, and 1508.13. An environmental assessment is a "concise public document" providing "sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]." *Id.* § 1508.9(a)(1). A FONSI is a finding that the proposed action "will not have a significant effect on the human environment" and for which an EIS is not required. *Id.* § 1508.13.

### 1. NEPA's Standard of Review for FONSI

■ Review of an agency's determination to adopt a FONSI instead of preparing an EIS is governed by the arbitrary and capricious standard. 5 U.S.C. § 706(2)(A). This standard requires the plaintiff to show a "substantial possibility that agency action 'could significantly affect the quality of the human environment.'" *Quinonez–Lopez v. Coco Lagoon Dev. Corp.,* 733 F.2d 1, 2 (1st Cir.1984) (quoting *Winnebago Tribe v. Ray,* 621 F.2d 269, 271 (8th Cir.1980)). The court must carefully review the administrative record to ascertain whether the agency decision is "founded on a reasoned evaluation of the relevant factors." *Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (quotation marks omitted). The Court "must essentially look to see if the agency decision, in the context of the record, is too 'unreasonable' (given its statuto-

ry and factual context) for the law to permit it to stand." *Sierra Club v. Marsh,* 769 F.2d 868, 870 (1st Cir.1985). "Thus it is clear that the reviewing court's function is not to second-guess the choices made by government officials, but rather to assess their process of arriving at those choices." *Town of Norfolk v. U.S. Envtl. Prot. Agency,* 761 F.Supp. 867, 873 (D.Mass.1991) (Mazzone, J.), *aff'd,* 960 F.2d 143 (1st Cir. 1992) (unpublished disposition).

■ This Court has adopted a two-step review of agency decisions under NEPA. *City of Waltham v. U.S. Postal Service,* 786 F.Supp. 105, 115 (D.Mass.1992), *aff'd,* 11 F.3d 235 (1st Cir.1993). First, the reviewing court must conduct a substantive review of the agency's action to ensure that the decision was not arbitrary and capricious. *Id.* The Supreme Court has made clear that, in conducting an "arbitrary and capricious" review of agency decision-making under section 706(2)(A) of the Administrative Procedure Act, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). Second, the court must review whether the agency has complied with the duties or procedural requirements that NEPA places upon it. *Grazing Fields Farm v. Goldschmidt,* 626 F.2d 1068, 1072 (1st Cir.1980); *City of Waltham,* 786 F.Supp. at 115.

■ In the summary judgment context, the Court "should grant summary judgment for the defendant agency unless the Court's review of the record reveals that the plaintiff has discovered therein a genuine issue of material fact as to whether the agency's decision was arbitrary and capricious or otherwise an abuse of discretion." *City of Waltham,* 786 F.Supp. at 115 (citing *Town of Norfolk,* 761 F.Supp. at 873–

74 (citing *Concerned Citizens on I–190 v. Secretary of Transp.*, 641 F.2d 1, 7 (1st Cir.1981))). The Court notes that the submissions of the parties make so many fundamentally contradicting factual claims "that one is tempted to think some 'material' factual issue must be in dispute." *Valley Citizens for a Safe Env't v. Aldridge*, 886 F.2d 458, 461 (1st Cir.1989). The Court must determine, however, whether there are any unresolved disputes of material fact that actually have a basis in the administrative record. *See id.; see also Town of Norfolk*, 761 F.Supp. at 874.

## 2. Substantive Adequacy of the Corps' FONSI

■ To assess the substantive adequacy of the Corps' FONSI, the Court applies a four-part analysis ("*Waltham* Test"): (1) the agency must have accurately identified the relevant environmental concerns; (2) once the agency has identified the problem it must have taken a "hard look" at the problem in preparing the environmental assessment; (3) if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding; and (4) if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that changes or safeguards in the project sufficiently reduce the impact to a minimum. *City of Waltham*, 786 F.Supp. at 121; *see Coalition on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66–67 (D.C.Cir. 1987). If the agency's environmental assessment and FONSI satisfy the *Waltham* Test, the FONSI is considered substantively adequate.

The first part of the *Waltham* Test is not disputed. The Advocates do not challenge whether the Corps identified the relevant human and natural environmental concerns. After review of the Assessment, the Court concludes that the Corps

accurately identified the relevant environmental concerns related to the Greenbush Project. These relevant environmental concerns include impacts of the main alternatives on wetlands, wildlife habitat, and air quality, as well as the noise, vibration, traffic, and aesthetic impacts on historic and non-historic areas. AR I:11988–89, 11992. The Assessment identified human and environmental concerns in the five Massachusetts coastal towns of Braintree, Weymouth, Hingham, Cohasset, and Scituate, where the Greenbush Project would require construction. AR I:11998. The Assessment also identified impacts on bordering towns of Norwell, Marshfield, and Duxbury that would be served by the Greenbush Commuter Rail alternative. *Id.* The Corps identified a sufficient range of environmental concerns on both historic and non-historic areas to satisfy the first part of the *Waltham* Test.

The majority of the Advocates' NEPA claims center on the second part of the *Waltham* test. The Advocates allege that the Corps failed to take a "hard look" at the impacts pursuant to NEPA Council regulations. Pls.' Mem. Summ. J. [Doc. No. 40] ("Pls.' Mem.") at 2. The Advocates argue that an EIS must be prepared because the impacts from the Greenbush Project meet the "intensity factors" in the NEPA Council regulations. Pls.' Mem. at 3.

To aid agencies in determining if an impact is significant, the NEPA Council developed regulations that list factors by which the intensity and severity of impacts should be judged. 40 C.F.R. § 1508.27(b). It is the "degree to which the effects" implicate the factors that determine significance. *See, e.g., id.* § 1508.27(b)(2) ("The degree to which the proposed action affects public health or safety"). While some courts have held that the presence of one or more of these intensity factors *may*

*be* sufficient to require an EIS,[14] the Advocates inaccurately assert that the presence of a single one of the factors warrants an EIS. Pls.' Mem. at 3. The list of intensity factors does not serve as a "checklist." *Friends of the Earth v. U.S. Army Corps of Eng'rs,* 109 F.Supp.2d 30, 42 (D.D.C. 2000). Rather, the list of factors aids agencies in determining whether an EIS is required. The Court will address the factors raised by the Advocates to determine if the degree of human and environmental impacts are significant and thus require the preparation of an EIS.

### a. Factor 1: Impacts that are beneficial and adverse

The Advocates argue that the Corps violated NEPA by "unlawfully balancing" the benefits and negative impacts of the Greenbush Project to reach a finding of no significant impact. Pls.' Mem. at 3–4. "A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial." 40 C.F.R. 1508.27(b)(1). The First Circuit has held that an environmental assessment:

> [A]ims simply to identify (and assess the 'significance' of) potential impacts on the environment; it does not balance different kinds of positive and negative environmental effects, one against the other; nor does it weigh negative environmental impacts against a project's other objectives.... This latter balancing job belongs to the officials who decide whether to approve the project; and (where there are 'significant effects') those officials should make the decision in light of an EIS. An EIS helps them make their decision by describing and evaluating the project's likely effects on the environment. The purpose of an E[nvironmental] A[ssessment] is simply

to help the agencies decide if an EIS is needed.

*Sierra Club,* 769 F.2d at 875.

Nothing in the Administrative Record supports the Advocates' allegations that the Corps' "claim that the [Greenbush] Project's net impact is beneficial." Pls.' Mem. at 4. At most, the Corps points to potential environmental benefits of the Greenbush Commuter Rail alternative but never claims a resulting net environmental benefit of the Commuter Rail alternative. For example, in the analysis of air quality impacts of the Commuter Rail alternative, the Corps stated that there would be a "net decrease" in certain air pollutants by 2010, an "increase" in one type of air pollutant over the same time period, and a "likely" air quality benefit from a change in the type of diesel fuel used in the trains. AR 1:12027. The Corps did not conclude that there *will be* net beneficial air quality impacts of the Commuter Rail alternative nor does the Corps base its FONSI solely on these possible benefits or decreases in air pollution.

▮▮▮ Based on the considerations given both to beneficial and adverse impacts and mitigation measures, the Court concludes that the Corps did not "balance different kinds of positive and negative environmental effects, one against the other." *Sierra Club,* 769 F.2d at 875. The Record reflects that the Corps necessarily considered all types of impacts and mitigation measures to determine the degree, and consequently the significance of the potential impacts on the environment. AR I:12022–35. It is appropriate for the Corps to consider mitigation measures in its Assessment and FONSI determination. "Mitigation measures may be relied upon

---

**14.** *See Ocean Advocates v. U.S. Army Corps of Eng'rs,* 402 F.3d 846, 865 (9th Cir.2005) ("We have held that one of these [intensity] factors may be sufficient to require preparation of an EIS in appropriate circumstances.").

to make a finding of no significant impact only if they are imposed by statute or regulation, *or submitted by an applicant or agency as part of the original proposal.*" *Sierra Club,* 769 F.2d at 877. For example, the Corps considered the impact of railbed pollutants on water quality by identifying the impacted water sources, types and level of concentrations of these pollutants, the railbed drainage system design, and in-place mitigation measures to conclude that the impact on surface and groundwater quality would be insignificant. AR I:12024–25. These considerations are a necessary part of the Corps' FONSI determination under NEPA and one of the "endless series of judgment calls" an agency must make during the NEPA process. *City of Waltham,* 786 F.Supp. at 127. The Corps did not unlawfully balance positive and negative impacts to determine the significance of human and environmental impacts.

b. Factor 2: Public Health and Safety

The Advocates allege that the public health or safety risks of train accidents and diesel exhaust emissions from Greenbush Project warrant the preparation of an EIS. Pls.' Mem. at 7. According to the NEPA Council's intensity factors, the significance of an action should be considered in light of the "degree to which the proposed action affects public health or safety." 40 C.F.R. 1508.27(b)(2).

 It is undisputed that there are risks associated with cars and pedestrians at grade crossings and potential injury to trespassers because of the proximity of residential areas and schools to the Greenbush Commuter Rail alternative. AR II:V–27. In assessing the degree of impact to public health and safety, the Corps considered the risks of accidents and the mitigation measures taken by the MBTA in determining that safety was not a significant issue requiring the preparation of an EIS. *See* AR I:12048 (noting that "[p]otential train-related accidents [could be] mitigated by protective gates.") The MBTA has committed to mitigative measures such as warning lights and bells, fencing, railroad signal systems, and supplemental safety measures that are required by federal or Massachusetts regulations.[15] AR II:VIII–24.

With respect to public health risks from diesel emissions, the Advocates quote general statements from the MBTA's Final Report regarding health concerns associated with small particulate matter emissions and incorrectly conclude that the preparation of an EIS is mandated. Pls.' Mem. at 2–3. These generic health concerns are not specific to the Greenbush Project's potential impacts. The MBTA did analyze the specific health impacts associated with diesel-engine trains and concluded that operation of trains along the Greenbush right-of-way will not result in concentration levels that will cause health impacts. AR II:V–52. As noted in the Corps' Assessment, transportation sources are a minor contributor of particulate emissions compared to sources like power plants and incinerators, AR I:12020, and the projected

15. It is appropriate for the Corps to consider these mitigating measures in their Assessment and FONSI because they were part of the Section 61 findings and mitigative plan that are binding under MEPA. i 301 Mass.Code Regs 11.01(1)(c) (requiring an agency submitting an MEPA Environmental Impact Report to incorporate Section 61 findings and mitigation plans into any permits or certificates approving the agency action); *see also* AR I:8872 [Certificate of the Secretary of Environmental Affairs on the Final Impact Report, Aug. 17, 2001] (requiring the MBTA to "prepare and adopt a Final Section 61 Finding pursuant to MEPA, which details all of the agency's enforceable commitments to actions *that will avoid, minimize, or mitigate the project's environmental impacts*").

increase in particulate matter emissions was "so small as to be considered zero since it would be well within the margin of error of the analysis." AR I:12027. Furthermore, after the air quality analysis was conducted, the MBTA began using low-sulfur diesel in all its trains, "bringing it to what is likely to be an air quality benefit for the project" for particulate matter emissions. Therefore, the *degree* of the public and safety impacts from the Greenbush Project is not significant and do not warrant an EIS.

### c. Factors 4 & 5: Controversy and Uncertainty

The NEPA Council regulations require that the Corps consider the "degree to which the effects on the quality of the human environment are likely to be highly controversial .... [or are] highly uncertain or involve unique or unknown risks" when determining whether an EIS is necessary. 40 C.F.R. § 1508.27(b)(4), (5). The First Circuit has not defined what constitutes "highly controversial" or "highly uncertain". Other circuit courts have defined a "federal action [as] controversial if 'a substantial dispute exists as to [its] size, nature, or effect.'" *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1333 (9th Cir.1992) (quoting *Rucker v. Willis*, 484 F.2d 158, 162 (4th Cir.1973)); *see Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190, 1193 (9th Cir.1988) (concluding that "affidavits and testimony of conservationists,

biologists, and other experts who were highly critical of the [environmental assessments]" satisfied the highly controversial standard under 40 C.F.R. § 1508.27(b)(4)).

The Advocates allege that the air pollution and traffic benefits asserted by the MBTA are highly uncertain and controversial.[16] Pls.' Mem. at 9. They argue that the Corps relied on the heavily criticized and flawed MBTA's ridership model in its comparison of alternatives in its Assessment and FONSI. *Id.* The Record indicates that there were substantial negative comments regarding the MBTA's ridership model. The Federal Transit Administration, prior to its withdrawal from the project, noted that the mode of choice model used by the MBTA to compare bus and commuter rail alternatives was "insensitive" to important factors generally addressed in mode of choice models. AR I:270.

The Corps admitted to deficiencies in its ridership models in its review of the MBTA's Supplemental Environmental Impact Report/Statement pursuant to both NEPA and MEPA. *See* AR V:3–40. In May 1998, Louis Berger & Associates and ENSR, consultants who conducted the ridership model review for the Corps, concluded that the "accuracy of the alternatives analysis is highly questionable" because it was based on this Greenbush ridership forecasting methodology. AR

---

**16.** The Advocates also allege that the "voluminous comments of agencies, experts, affected parties and others shows [sic] the extremely controversial nature of the entire Project's size and effects." Pls.' Mem. at 8. The Court does not agree. Evidence of many comments during the public comment period does not indicate per se a high level controversy. For instance, a large number of comments in support of the Greenbush Project is not evidence of high controversy regarding the effects on the quality of the environment. *See* AR I:12055 ("Many of these comments [received

during the public review period] expressed general support for the MBTA's preferred alternative and its benefits.") It is the substance and subsequent response or lack of response to those comments that may or may not demonstrate a high level of controversy. The Advocates fail to recognize that the Corps and the MBTA addressed public comments in its Assessment. *See* AR I:12055–77 (summarizing comments in opposition to the MBTA's proposed action and the MBTA and Corps response to those comments).

V:3, 35. The Corps recommended that the MBTA's ridership model be "expanded," "modified," and "calibrated" to include more variables to better predict impact on ridership. AR I:7071. Subsequent to recommendations from the Corps in 1998, one of the Advocates' transportation experts concluded that "analysis reported in Chapters II and IV of the MBTA Greenbush Corridor FEIR is not adequate to support any conclusions about mode ridership in the Greenbush corridor. The methods used are out of date, arbitrary and, in some cases, inconsistent. [The inconsistencies of the model] ... place the results in doubt." AR V:79–80; Aff. of Frank S. Koppelman, Ph.D.

■ Though these reports and critical reviews of the ridership model are noteworthy, the Court grants substantial deference to the agency's choices regarding methodology and technical analyses. *Town of Norfolk v. U.S. Army Corps of Eng'rs*, 968 F.2d 1438, 1446 (1st Cir.1992) ("[T]he ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the [Corps].") The Corps considered criticisms and numerous comments of the MBTA's methodology, but concluded that the model was sufficiently accurate in its review. *See* AR I:12060, 12063, 12069 (concluding that the ridership figures were "reasonable" and sound).

■ The Advocates contend that the Corps' response regarding the ridership model was "conclusory" and unreasonable because the Corps' FONSI determination was based on "insufficient, inaccurate, old and out of date data." Pls.' Mem. at 10 (citing *Sierra Club v. Babbitt*, 15 F.Supp.2d 1274, 1284 (S.D.Ala.1998)). In this case, the Corps' conclusion was reasonable as the methodology was *not* used to gauge the degree of impact on the environment; rather, it was used to predict the ridership trends of the alternatives to see which alternative would best meet the travel demands within the Greenbush Corridor. Furthermore, there is nothing in the Record that indicates that the alternate models would have presented a different alternative analysis conclusion. *See Town of Cave Creek, Arizona v. Fed. Aviation Admin.*, 325 F.3d 320, 331–32 (D.C.Cir.2003) (holding no NEPA "controversy" present when there is no indication that the proposed model would lead to different findings on environmental effects). The Court concludes that the Corps examined the substantive comments regarding the model and reasonably determined that there was "no substantive flaw in the analysis that would change this conclusion concerning alternatives that include commuter rail." *See* AR I:12069.

■ In addition, the Advocates argue that comments from the Environmental Protection Agency ("EPA") implicate the "controversy" and "uncertainty" factors by citing EPA's suggestion that the Corps prepare an EIS for the Greenbush Project. Pls.' Mem. at 8–9. Yet "a disagreement [between federal agencies] as to whether an EIS should be commissioned is not by itself grounds for a court to require an EIS." *Roanoke River Basin Ass'n v. Hudson*, 940 F.2d 58, 64 (4th Cir.1991); *see Commonwealth of Massachusetts v. Andrus*, 594 F.2d 872, 886 (1st Cir.1979) ("NEPA requires only that an agency respond adequately to EPA criticisms of a proposed action; the EPA view is not to be treated as controlling.") Furthermore, the Record reflects that the substantive issues that EPA raised were made in 1999 prior to the MBTA's Final Report and subsequently were addressed in the Corps NEPA process. AR I:7500, 12030–33, 12044–45, 12062–63, 12027.

The Advocates next point to comments from EPA regarding air quality and travel benefits as controversy that merits the preparation of an EIS. Pls.'s Mem. at 11. They argue that there is uncertainty regarding whether the Greenbush Project is required by the Massachusetts State Air Quality Implementation Plan to achieve air quality benefits. *Id.* The Advocates rely on and quote a letter from the EPA Region 1 stating that the requirement to restore the Old Colony commuter rail is not a requirement of the Clean Air Act. *Id.* This argument is taken out of context. The letter written by the EPA Region 1 was a response to concerns raised by a selectman from the Town of Hingham regarding locomotive diesel exhaust. AR V:181–82. The letter states that the federal Clean Air Act does not mandate the Old Colony commuter rail restoration and operation, but that Massachusetts "adopted this measure as part of a systemwide set of strategies designed to mitigate additional emissions from the Central Artery improvements.... EPA plays a very limited role in assessing the Commonwealth's choice of control measures in the [State Air Quality Implementation Plan]." AR V:181. Essentially, this letter supports the Corps' use of the air pollution reduction targets required under the Massachusetts State Air Quality Implementation Plan to evaluate the feasibility of the various alternatives. AR I:12041–43. There is no uncertainty regarding the applicable requirements of the Greenbush Project. The Corps necessarily used air quality targets to assess the Greenbush Project alternatives as required under state law.

■ Lastly, the Advocates claim that uncertainty and unknown risks regarding air pollution effects, traffic benefits, and impacts on unidentified historic resources demand the preparation of an EIS. Pls.' Mem. at 12–14. An environmental assessment is intended to be "an overview of environmental concerns, *not* an exhaustive study of all environmental issues which the project raises," and, therefore, it need not discuss the merits and drawbacks of the proposal in exhaustive detail. *Don't Ruin Our Park v. Stone,* 802 F.Supp. 1239, 1247 (M.D.Pa.1992) (emphasis in original).

■ The Advocates are correct in asserting that there are unknown and uncertain health risks concerning particulate emissions from diesel engines, AR II:V–50–51, uncertain traffic benefits from lack of full latent travel demand analyses, AR II:IV–19–23, and risks to historic resources unknown to the agencies involved in the Section 106 consultation under the Preservation Act, AR I:11933–34. Although these uncertainties exist, the Corps is not required to eliminate all risks or resolve all general scientific uncertainties in its Assessment. *Blue Ocean Pres. Soc'y v. Watkins,* 767 F.Supp. 1518, 1526 (D.Haw.1991) (holding that since the environmental assessment itself is done as a preliminary study to determine whether more in-depth analysis is required, "an [environmental assessment] is necessarily based on incomplete and uncertain information.") The Court concludes that the Corps adequately identified these uncertain risks and reasonably concluded that they are not "highly uncertain" or involve "highly unknown" risks based on the probable results of the MBTA's mitigation measures and construction plans. *See* 40 C.F.R. § 1508.27(b)(5); *Trout Unlimited v. Morton,* 509 F.2d 1276, 1283 (9th Cir. 1974) (concluding that NEPA requirements have been satisfied as long as an environmental assessment contains a "reasonably thorough discussion of the significant aspects of the probable environmental consequences.")

#### d. Factor 5: Uniqueness Factor

The Advocates argue that the impacts of the Greenbush Project upon state-designated Areas of Critical Environmental Concern ("ACEC"),[17] recreation areas, wetlands, and scenic rivers implicate the NEPA Council regulations' "significance" factor relating to unique characteristics. Pls. Mem. at 7–8. The Corps may consider to what degree the ACEC are impacted when activities in ACECs and scenic rivers occur in accordance with the direction of the state agencies with regulatory responsibility over such areas. *See* 301 Mass. Code. Reg. 12.12 (requiring state agencies to "take action, administer programs, and revise regulations" to ensure that activities in or impacting the area are carried out so as to minimize adverse effects on environmental, recreational, historic, and scenic state resources). The ACECs and scenic river areas were reviewed by Massachusetts state agencies, and these agencies' approvals of the Greenbush proposal undermine the Advocates' claim of significance. AR II:III–64–65; AR I:8289, 8293–97.

The Advocates allege that impacts upon federal jurisdictional wetlands constitute a significant impact under the "unique characteristic" intensity factor. Pls. Mem. at 7–8. In considering the degree and significance of adverse impacts to wetlands, the Corps reviewed the MBTA's binding commitments[18] under MEPA's regulations extensively to mitigate impacts on wetlands[19] and concluded that there will not be any net loss in ecological functions and values associated with the filling of the wetlands. AR I:12048. As a further guarantee of implementation of the wetlands mitigation measures, the Corps has incorporated the MBTA's mitigation plan as a special condition to the Permit. AR I:12048. Based on these binding mitigation measures, it was reasonable for the Corps to conclude that the impacts to the wetlands would not be significant.

Likewise, the loss of recreation on the Greenbush right-of-way is to be mitigated through other recreational opportunities that will be created by the MBTA. AR I:12047 (new bike path, boat launching facilities, and municipal recreation facilities).

#### e. Factor 8: Historic Resources Impact

The Advocates allege that the adverse impacts upon historic resources associated with the Greenbush Project mandate the preparation of an EIS. Pls.'s Mem. at 5–7. The NEPA Council regulations look to

---

17. The Areas of Critical Environmental Concern Program was established by the Commonwealth of Massachusetts in 1975. Mass. Gen. Laws ch. 21A, § 2 (2005). Areas are designated by the Massachusetts Secretary of Environmental Affairs in order to encourage their protection and preservation. 301 Mass. Code. Reg. 12.03 (2006). Existing environmental regulatory programs provide for higher performance standards for activities proposed in an ACEC. *See id.* § 12.12.

18. MBTA is required to adopt all mitigation measures identified in a Final Section 61 Finding pursuant to MEPA. These measures are considered enforceable commitments. 301 Mass.Code Reg. 11.01(4)(c)(2).

19. The MBTA Mitigation Plan states:

> Where permanent wetlands impacts cannot be avoided, compensatory mitigation in the form of wetlands restoration or replication will take place. These mitigation measures will be designed to replace the functions and values of the impacted resource. The MBTA will, at a minimum, provide a 1:1 functionally equivalent wetland replacement in the same watershed area as the wetland being replaced, with a target of up to a 2:1 replacement ratio. The additional replacement, beyond the 1:1 level, may be in nearby watershed areas, in different wetland types, or may be replaced by other actions that enhance the general wetlands or conservation environment.

> Ar II:VIII–65 [Section 61 Findings and Mitigation Measures from Final Report].

"[t]he degree to which the action may adversely affect" such historic resources to determine whether there is an impact of sufficient significance to warrant an EIS. 40 C.F.R. § 1508.27(b)(8). The Preservation Act regulations state that "[a] finding of adverse effect on a historic property does not necessarily require an EIS under NEPA." 36 C.F.R. § 800.8(a)(1). Under the Preservation Act, impacts to historic resources can range from the severe, such as the demolition of historic buildings, to potentially less impacting, such as a change in the visual surroundings of the historic property. *Id.* § 800.5(a)(2). It is undisputed that the Greenbush Project will have adverse impacts on twenty-seven historic properties and thirty-four historic districts in the area affected by the Greenbush Project. AR I:11998, 12030–32. These adverse effects include the introduction of noise, vibration, traffic, and aesthetic impacts. AR I:11998.

The Advocates claim that these adverse impacts to historic resources are significant because these impacts will still be listed as "severe" post-construction and mitigation of the Greenbush Project. Pls.' Mem. at 6. In conducting its NEPA analysis, the Corps appropriately can consider the relative significance of the different types of impacts. Thus, while a number of historic properties will be impacted by the Greenbush Project, the Corps determined that these impacts do not rise to the level of NEPA significance. AR I:12030 ("No buildings that are listed or eligible for listing on the National Register of Historic Places will be taken, destroyed, or negatively altered because of this project.").

For example, the Record reveals that while a number of properties eligible for listing on the National Register will be affected by vibration from trains above detectable threshold levels, none will occur at levels that will cause even cosmetic damage to fragile historic structures. AR III:8851 (threshold of 95 VdB for potential cosmetic damage to fragile historic structures); AR III:8930–9004 (no vibration impacts reach 95 VdB). Likewise, the visual impacts and effects to the setting of historic properties do not rise to the level of significance under NEPA, as the MBTA will be taking extensive mitigation measures such as building a tunnel beneath a Hingham historic district and utilizing plantings, fencing, and dark colored project fixtures, as well as numerous other measures. AR I:11916–59, 12044.

As a result of the Section 106 consultation under the Preservation Act, the Corps, the Preservation Officer, and the Advisory Council concluded that the MBTA mitigation measures will minimize the adverse impacts on historic resources to their satisfaction as evidenced by the executed programmatic agreement ("Agreement"). It is appropriate for the Corps to take these mitigation measures into consideration in its Assessment and FONSI determination. *See* AR I:11913; *Sierra Club v. Marsh,* 769 F.2d at 877. Here, the Agreement is part of the Preservation Act's regulatory requirements. *See* 36 C.F.R. § 800.6(b)(1)(iv) ("If the agency official and the [state preservation officer] agree on how the adverse effects will be resolved, they shall execute a memorandum of agreement."). The Agreement is binding on the MBTA because it was incorporated as a required condition of the Corps Permit. AR I:12045.

f. Conclusion of the Court's Substantive Review: the FONSI is neither Arbitrary nor Capricious.

The Court has reviewed the extensive record regarding the disputed areas of impact in light of the *Waltham* four-part analysis. *City of Waltham,* 786 F.Supp. at 121. First, the Corps, through its Assess-

ment, has identified all of the environmental concerns raised by the Advocates, including wetlands, air quality, traffic, noise, and historic resources impacts. *See id.*

Second, the Record establishes that the Corps took a hard look at most of the identified environmental concerns. *See id.* The Corps reasonably addressed factors in determining whether to prepare an EIS by properly identifying, reviewing, and considering the environmental impacts associated with the Greenbush Project. The Corps' conclusion that the degree of these impacts did not rise to the level of significant impact as defined by the NEPA Council regulations was neither arbitrary nor capricious and was reasonably based on technical and scientific review. Third, the Corps has made out a convincing case that the mitigation measures would adequately address the impacts associated with the Greenbush Project. *See id.* The Court need not address the fourth part of the *Waltham* Test as the Corps did not find an impact of "true significance" as discussed above. *See id.*

### 3. COUNTS II and IV: Procedural Adequacy of the Assessment and FONSI

The Advocates' Counts II and IV claim that the Assessment and FONSI are procedurely inadequate because the Corps utilized improper process in determining the least environmentally damaging practicable alternative for the Greenbush Project, Pls.' Mem. at 14–18, and failed to seek public comment on the Assessment and FONSI, Compl. ¶¶ 142–46.

### a. Count II: The Least Environmentally Damaging Practicable Alternative under the Clean Water Act

The Advocates question whether the Corps reasonably determined under the Clean Water Act, Section 404 Guidelines, that there were no practicable alternatives to the Commuter Rail that could meet the project purpose. Pls.' Mem. at 14–18. The Advocates' argument consists of two parts: (1) the screening criteria used; and (2) the Corps' application of the screening criteria through the use of ridership models and the selection and elimination of alternatives. *Id.* The Clean Water Act requires that the Corps cannot issue a dredge or fill permit where "there is a practicable alternative . . . which would have less adverse impact on the aquatic ecosystem." 40 C.F.R. § 230.10(a). Moreover, if a dredge or fill permit application does not concern a water-dependent project, the Corps assumes that practicable alternatives exist unless the applicant "clearly demonstrated otherwise." *Id.* § 230.10(a)(3).

 In compliance with the Section 404 Guidelines, the Corps must select the least environmentally damaging practicable alternative. 40 C.F.R. § 230.10(a). When conducting its practicable alternatives analysis, the Corps is entitled to rely on information contained in an NEPA EIS or state-required Environmental Impact Report. *See Town of Norfolk v. U.S. Army Corps of Eng'rs,* 968 F.2d at 1447–48. "Under the practicable alternatives test, the Corps is not required to conduct an independent feasibility evaluation of each alternative site merely because a party disagrees with its ultimate conclusion." *Id.* at 1448.

In this case, the Corps evaluated seven categories of alternatives considered during the draft state environmental impact report process and six additional variations on those alternatives developed by the MBTA in response to public comments or at the request of the Corps. AR I:12053–54; *see* AR I:12055–76. Following the Corps' review of these alternatives and its consideration of public comments, the Corps determined that there was no prac-

ticable alternative to the Commuter Rail project because the alternatives failed to provide sufficient transportation and air quality standards as defined by state law. AR I:12043–44, 12055–76.

The Advocates allege that the Corps relied on screening criteria identified by other parties and failed to make its own assessment of the appropriate criteria in determining the least environmentally damaging practicable alternative. Pls.' Mem. at 15. In its Section 404 Guidelines analysis, the Corps stated that the "project purpose is to improve transportation facilities in the Greenbush corridor in order to increase capacity, relieve severe highway and transit congestion, provide an equitable distribution of transit services, and meet clean air and highway mitigation mandates." AR I:12052. From this articulation of purpose, the Corps identified screening criteria for evaluation of alternatives to the Commuter Rail that satisfy this project purpose. The screening criteria sought alternatives that provide transportation facilities for the Greenbush corridor, provide a reasonably equivalent level of reductions in vehicle miles traveled and the associated air quality benefits, increase equitable mass transit capacity, and relieve severe highway and transit congestion. AR I:12053.

The Advocates argue that the Corps improperly relied on air quality and transportation goals set by the Commonwealth in 1992 without further assessment. Pls.'s Mem. at 16. The Advocates are correct in asserting that the goals used in developing the screening criteria were developed by the Massachusetts Department of Environmental Protection in June 1992 as required under Massachusetts air quality regulations. AR I:12042. The Corps' Assessment does not provide an explanation for whether these state goals set in 1992

were updated or revised. *See* Pls.'s Mem. at 16.

After reviewing the Record, the Court determines that the new circumstances the Advocates identified (e.g., diesel engine emissions, NOx emissions, EPA 1999 letter) were appropriately addressed and reviewed when the Corps analyzed each of the alternatives and its respective impacts. *See* AR I:12027 (analyzing NOx emissions based on the MBTA's adoption of Low Diesel Fuel in its trains after the Final Report was issued in 2001). The Corps identified screening criteria based on the project purpose and available data and did not act in an arbitrary or capricious manner in applying state-required air quality and transportation goals.

The Advocates mainly contend that the Corps erred in its practicable alternatives analyses by relying on ridership models prepared by MBTA in connection with the state environmental impact report. Pls.' Mem. at 16–17. The Corps correctly argues that challenges to MBTA's modeling methodology is "merely a battle of experts". Def. Corps Mem. Supp. Mot. Summ. J. [Doc. No. 47] ("Corps' Mem.") at 18. The Corps reasonably determined that the MBTA's modeling outcomes were appropriate for the project and professionally acceptable. *See* AR I:12069 ("We find no substantive flaw in the analysis that would change this conclusion concerning alternatives that include commuter rail."). Such a decision is neither arbitrary nor capricious. *See Associated Fisheries of Maine, Inc. v. Daley,* 127 F.3d 104, 110 (1st Cir.1997) ("[When an agency is] faced with conflicting scientific views and chooses among them, its decision cannot be termed arbitrary or capricious.") The Record reveals that the Corps considered contrary opinions regarding the ridership

model,[20] the MBTA's expert's responses to those criticisms, and the actual model itself. AR I:13446–65; AR II:VI–2–13. The Corps reviewed the MBTA's evaluation of commuter rail ridership that used data from the other commuter rail lines in the MBTA system. AR II:IV–8. The MBTA evaluated ridership potential of bus and boat alternatives using a "pivot point" model initially created for use by the EPA. AR II:IV–10. Though the Advocates' disagree with the Corps' conclusion regarding the choice of the ridership model used, the Court concludes that the Corps did not turn a blind eye to the criticisms of the ridership model and made a reasonable determination that the model was adequate to evaluate the alternatives.

The Advocates also allege that the Corps' analyses of the alternatives did not support its conclusion that the Commuter Rail alternative was the only viable option to meet the state's air quality standards. Pls.' Mem. at 17. Pursuant to current Massachusetts regulatory requirements, an alternative to Greenbush Commuter Rail must achieve equal or greater reductions in emissions of three specified air pollutants and in vehicle miles traveled. 310 Mass.Code Reg. § 7.36(4); AR I:12042. Based upon the models and analysis, the alternatives to Commuter Rail did not achieve equal or greater emissions reductions for each of the three pollutants or in vehicle miles traveled. AR I:12027, 12036, 12039; see AR I:7976 (stating that the EPA's opinion that the superboat alternative will result in significantly worse air quality impacts than the Commuter Rail). Although the modeling showed that the Commuter Rail alternative may result

in increases in NOx and particulate emissions, these increases are not significant and will likely be mitigated. AR I:7976, 12027; AR II:V–54–56.

The Corps sufficiently addressed the alternatives and their capacity to meet the travel needs of the Greenbush area.[21] As a result of reviews by various state agencies and the public, the MBTA developed five additional alternatives to consider as part of the Final Report. AR I:12054. In addition, the Corps requested the MBTA to undertake analysis of an additional "superboat" alternative, which included enhanced boat service in combination with express buses and rail service from a proposed Accord terminal. *Id.* The Corps concluded that none of these alternatives generated sufficient ridership to meet the project purpose. AR I:12056, 12075–76. Though the Advocates argue that these conclusions were baseless because of the ridership model, the Court determines that the Corps' decision in choosing to rely on the model used by the MBTA was neither arbitrary nor capricious.

In addition, the Advocates claim that, since elimination of certain alternatives, new impacts have been identified and costs have escalated. Pls.' Mem. at 18–19. The Corps did not eliminate alternatives based upon impacts or costs, however, but it reviewed and decided in 2005 that certain alternatives should be eliminated because they did not achieve the project purpose. *See* AR I:12012 (Route 3 commuter rail does not serve the Greenbush transportation corridor); AR I:12075; AR II:A–61–69 (inadequate ridership from Accord or West Hingham).

**20.** Many comments criticizing the model are set forth in the Summary of Comments of the Assessment and FONSI. AR I:12055–76.

**21.** The Corps sufficiently refuted the Advocates' allegations that the Corps failed to max-

imize ridership in the Corps analyses in respect to the Hingham parking capacity, the Silver Line connections, Quincy Commuter Boat, and equalizing transit fares. *See* Corps' Mem. at 19–20.

■ Though it is undisputed that other alternatives would have resulted in less environmental impact than the Greenbush Commuter Rail alternative, the Corps' practicable alternatives analyses was reasonable and its choice of the Commuter Rail alternative was neither an arbitrary or a capricious decision nor an abuse of discretion.

### b. Count IV: Failure to Seek Public Comment

The Advocates allege that Corps violated the NEPA and Corps' regulations by failing to circulate a draft of the Assessment and FONSI for a thirty-day review and public comment. Compl. ¶¶ 142–46. Nothing in the NEPA Council regulations requires circulation of a draft environmental assessment for public comment, except under certain "limited circumstances." 40 C.F.R. § 1501.4(e)(2); *Alliance to Protect Nantucket Sound, Inc. v. U.S. Dep't of the Army*, 398 F.3d 105, 115 (1st Cir.2005). A draft FONSI must be made available for public comment when "the nature of the proposed action is one without precedent" or the "proposed action is, or is closely similar to, one which normally requires the preparation of an environmental impact statement under the procedures adopted by the agency." 40 C.F.R. § 1501.4(e)(2)(i),(ii). Corps regulations apply a thirty-day public comment requirement to draft FONSIs and environmental assessments "[i]n the case of feasibility, continuing authority, or special planning reports and certain planning/engineering reports." 33 C.F.R. § 230.11.

■ The Advocates' argument fails on two grounds. First, the Corps regulations regarding public comment on Assessment and FONSI do not apply in this case. The courts have held that Section 404 permit applications are "distinct" from the "special planning reports and certain planning/engineering reports" as required by the Corps regulations. *Alliance to Protect Nantucket Sound, Inc. v. U.S. Dep't of the Army*, 288 F.Supp.2d 64, 79 (D.Mass.2003) (Tauro, J.), *aff'd*, 398 F.3d 105 (1st Cir. 2005).

Second, the draft Assessment and FONSI do not meet the limited circumstances outlined in the NEPA regulations for circulation for public review and comment. *See* 40 C.F.R. § 1501.4(e)(2). The restoration of a railroad right-of-way is not an unprecedented action as evidenced by the restoration of the Middleborough and Plymouth Lines. AR I:12052–53. Though there is merit to the Advocates' claim that the Greenbush Project is similar to projects that normally require the preparation of an EIS, this proposed action included in its permit application mitigation measures that were identified during the preparation of an EIS for the Middleborough and Plymouth Lines. In this respect, projects that include such mitigation plans and extensive review may not normally require the preparation of an EIS. The Corps, therefore, did not act unreasonably in deciding not to circulate a draft FONSI or Assessment.

### c. Conclusion of the Court's Procedural Review: The Corps' Assessment and FONSI Process was Procedurally Adequate

The Court has examined carefully the procedures followed by the Corps in light of the applicable Clean Water Act, Section 404 Guidelines and the public comment regulations for draft environmental assessments. The Court holds that the Corps' Assessment and FONSI process was neither arbitrary nor capricious and sufficiently complied with the procedural requirements of the Clean Water Act and NEPA.

#### 4. Count III: Public Interest Review Violation

 The Advocates present little in support of their allegations that the Corps violated Section 404 of NEPA in its evaluation of public interest criteria in its review. In the Assessment and FONSI, the Corps does permissibly weigh and balance factors in its public interest review of the Greenbush Project.[22] AR I:12045–48 (summary of public interest factors); AR I:12050–51 (public interest finding). The Corps weighs beneficial and detrimental impacts, but does not focus solely on environmental concerns as is the case for NEPA. *See* 33 C.F.R. § 320.4. Here, the public interest review led to the conclusion that the Greenbush permit was not contrary to the public interest. AR I:12050–51. Without further support for their allegation, the Advocates' claim does not have merit.

### B. Count V: National Historic Preservation Act Violation

The Advocates allege that the Corps violated Section 106 of the Preservation Act by failing to conduct sufficient analyses of alternatives, including the non-rail alternatives. Compl. ¶ 150; Pls.' Mem. at 19. Section 106 of the Preservation Act requires federal agencies to "take into account the effect" a federal undertaking will have on "any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register" and to "afford the Advisory Counsel on Historic Preservation . . . a reasonable opportunity to comment with regard to such

undertaking." 16 U.S.C. § 470f. Section 106 represents "a requirement that agency decisionmakers 'stop, look, and listen,' but not that they reach particular outcomes." *Narragansett Indian Tribe v. Warwick Sewer Auth.*, 334 F.3d 161, 166 (1st Cir. 2003). If an undertaking may have adverse impacts on historic properties, an agency must consult with the state Preservation Officer and the federal Advisory Council to determine steps to avoid, minimize, or mitigate such adverse impacts. 36 C.F.R. § 800.5(b). Once the agency, the Preservation Officer, and the Advisory Council reach concurrence regarding appropriate mitigation, they enter an agreement which evidences the agency's compliance with Section 106. 36 C.F.R. § 800.6(b)-(c).

It is undisputed that the Greenbush Project will have adverse impacts on historic properties in the affected area and the Corps and the MBTA were required to initiate consultation with the Advisory Council and the Massachusetts Preservation Officer pursuant to Section 106 the Preservation Act. The consultation concluded that the Greenbush Project would have adverse effect[23] on twenty-seven historic properties and thirty-four historic districts in the area affected by the Greenbush Project. AR I:11998, 12030–32. These adverse effects include the introduction of noise, vibration, traffic, and aesthetic impacts. AR I:11998.

 The record reveals that the Corps sufficiently considered and analyzed the impacts of the alternatives on historic re-

---

**22.** The Corps combines its regulatory public interest review with its Assessment and FONSI. *See* 40 C.F.R. § 1506.4 ("Any environmental document in compliance with NEPA may be combined with any other agency document to reduce duplication and paperwork.")

**23.** "An adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." 36 C.F.R § 800.5(a)(1).

sources. The Corps concluded that the Transportation System Management and the Ferry Service alternatives would have no adverse effect on historical resources. AR I:12037, 12040. It is undisputed that the potential historical effects of other non-rail alternatives would be lower than the Greenbush Commuter Rail option, "but that these other alternatives failed to meet the transit ridership requirements" of the Greenbush Project. AR I:12030. Though these alternatives would have no adverse impact on historical resources, the Preservation Act does not require that an agency chose the least damaging alternative; it requires that the agency complete the Section 106 consultation process by identifying adverse impacts on historic resources and develop methods to mitigate the identified adverse impacts. 36 C.F.R. § 800.5(b)-(c). That is what the Corps and MBTA did in this case.

The Corps engaged in Section 106 consultation with the Massachusetts Preservation Officer and the Advisory Council on the impacts of the preferred Greenbush Commuter Rail alternative, developed an inventory of historic properties affected, and a resource-by-resource assessment of the effect. AR I:12030. The Corps concluded that "[n]o buildings that are listed or eligible for listing on the National Register of Historic Places will be taken, destroyed, or negatively altered because of this [rail] project." *Id.* The Corps and the MBTA, in consultation with Massachusetts Preservation Officer and the Advisory Council, developed a mitigation package to minimize the impacts of the proposal on historic resources. *See generally* AR IV (historic resources technical reports). On March 1, 2001, the Corps, the Preservation Officer, the Advisory Council, and the MBTA executed a programmatic agreement ("Agreement") ensuring that the various mitigation measures would be carried out by the MBTA. AR I:11915. The terms of this Agreement were incorporated as required conditions of the Corps Permit. AR I:12045. This executed Agreement satisfies the Section 106 consultation requirements and is evidence of the Corps' compliance with Section 106. *See* 36 C.F.R. § 800.6(c).

The Advocates' claim that the Section 106 analysis was insufficient because it was based on a "defective" transportation model. This argument fails as the Agreement signifies that the agencies responsible for historic resources were satisfied that the impacts to the historic resources have been minimized to an acceptable level. "While the plaintiffs may disagree with the conclusion, they have no recourse under Section 106." *Neighborhood Ass'n of Back Bay v. Federal Transit Admin.*, 393 F.Supp.2d 66, 76 (D.Mass.2005) (Dein, M.J.).

## IV. CONCLUSION

The Court should issue summary judgment when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court has closely scrutinized the extensive administrative record to determine whether any such genuine dispute of material fact exists. The Court concludes that the Corps has provided an administrative record sufficient to review the substantive and procedural adequacy of its Assessment and FONSI process. There are, therefore, no genuine issues of material fact.

As matter of law, to prevail in its challenge of the Corps' decision not to prepare an Environmental Impact Statement, the Advocates must show a "substantial possibility that agency action 'could significantly affect the quality of the human environment.'" *Sierra Club v. Marsh*, 769 F.2d at 870 (quoting *Quinonez–Lopez*, 733 F.2d at 2). Based on the Court's review of the

Record, it concludes that the Advocates have not shown a substantial possibility of significant environmental impact. The Court holds, as matter of law, that the Corps' decision to issue the Permit was not substantively arbitrary or capricious under the Administrative Procedure Act and was procedurally adequate under the Clean Water Act and NEPA. Therefore, the Advocates' Motion for Summary Judgment is DENIED and the Corps' and the MBTA's Motions for Summary Judgment are GRANTED.

SO ORDERED.